# STATE OF CONNECTICUT *v.* JAMES GRAHAM
## (SC 20447)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of felony murder, conspiracy to commit robbery in the first degree, and carrying a pistol without a permit, the defendant appealed. The defendant and two friends, M and C, encountered the victim on a walking path and decided to rob him. C attempted to shoot the victim, but his gun jammed, and the defendant used his own gun to fatally shoot the victim. The three men took money and other belongings from the victim,

State *v.* Graham

and fled the scene. Approximately one week later, the defendant recounted the details of the incident to his friend, B. Around the same time, M described the incident to S, a friend, while they were together in M's backyard. At trial, B and S both testified, pursuant to cooperation agreements they each had with the state, regarding the conversations that they had with the defendant and M, respectively. Defense counsel objected when the state attempted to question S regarding the statement M had made to him, but the trial court determined that M's statement to S was admissible under the relevant provision (§ 8-6 (4)) of the Connecticut Code of Evidence embracing the hearsay exception for statements against penal interest. In making that determination, the court found that M was unavailable to testify, M's statement to S was sufficiently trustworthy, and the statement was against M's penal interest insofar as it implicated M in a plan to rob the victim, even if the statement also was, to some extent, self-serving. The defendant testified in his own defense, claiming that an unknown individual had shot the victim. During closing argument, the prosecutor suggested that the jury should discredit the defendant's testimony because he had tailored it to reflect the evidence presented by the other witnesses who had testified before the defendant took the stand. On the defendant's appeal, *held*:

1. The trial court properly admitted M's statement to S, in which M inculpated the defendant in the shooting:

a. The trial court did not abuse its discretion in admitting M's statement as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence: M's statement to S, which the state offered as a dual inculpatory statement insofar as it inculpated both M and the defendant, was against M's penal interest because M implicated himself in a plan to rob the victim and admitted his participation in the robbery, which gave rise to a homicide, exposing himself to a risk of punishment for conspiracy to commit robbery, robbery, and felony murder; moreover, regardless of the extent to which M's statement was intended to minimize his participation in the homicide by identifying the defendant as the shooter, the entire statement was self-inculpatory, including the specific portions in which M specifically identified the defendant as the shooter, because it exposed M to potential criminal liability for the same types of crimes with which the defendant was charged, and, inasmuch as this court concluded that M's entire statement was inculpatory, it declined the defendant's invitation to consider adopting a rule that prohibits the admission non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory; furthermore, the circumstances under which M made the statement were strongly indicative of its reliability, as M made the statement of his own volition, only one week after the crime took place, to an individual with whom he had a close relationship, during a casual encounter in his own backyard, and other evidence presented at trial, including video surveillance footage,

344 Conn. 825　　　OCTOBER, 2022　　　　827

State *v.* Graham

the testimony of other witnesses, and physical evidence corroborated the trustworthiness of M's statement.

　　b. The admission of M's statement to S did not violate the defendant's federal constitutional right to confront the witnesses against him: M's statement was nontestimonial, as it was made in an informal setting, on M's own initiative, and to a friend before any criminal charges had been filed, and, therefore, it was not made under circumstances that would lead to a reasonable belief that it would be available for use at a later trial; accordingly, the defendant's unpreserved confrontation clause claim failed under the third prong of *State* v. *Golding* (213 Conn. 233), insofar as this court was unable to conclude that an alleged constitutional violation existed.

2. The defendant could not prevail on his unpreserved claim that his right of confrontation under article first, § 8, of the Connecticut constitution was violated when the prosecutor, during closing argument, presented a generic tailoring argument: a generic tailoring argument is a comment, often made during closing argument, asking the jury to infer that the defendant had fabricated his testimony to conform to the testimony of previous witnesses, solely on the basis of the defendant's presence at trial and without reference to evidence from which the fact finder might reasonably infer that the substance of the defendant's testimony was fabricated in light of the evidence admitted at trial; in the present case, the prosecutor indicated that the defendant had listened to all of the testimony during the trial before deciding which pieces of evidence he would agree with, but in the context of noting that the defendant's account of the incident was inconsistent with his behavior on surveillance video and sharply diverged from the testimony of S and B, which supported the inference that the defendant's version of events was fabricated to conform to the evidence presented; accordingly, the challenged tailoring comments were specific rather than generic, as the prosecutor's suggestion of tailoring was tied to evidence admitted at trial that, if credited by the jury, could have supported the prosecutor's claims, and, therefore, the challenged comments did not violated the defendant's state constitutional right of confrontation.

3. This court declined to review the defendant's claim that the prosecutor improperly had elicited certain information contained in the cooperation agreements between the state and S and B, and improperly presented closing argument relating to that information: the defendant's claim was an unpreserved evidentiary claim masquerading as a claim of prosecutorial impropriety, because, during closing argument, the prosecutor merely commented on evidence that the trial court explicitly had allowed during S's and B's testimony, which was not improper, and the defendant failed to claim in his main brief filed with this court that the trial court had abused its discretion in admitting such testimony.

(*Two justices concurring separately*)

Argued February 23—officially released October 4, 2022

State *v.* Graham

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, conspiracy to commit robbery in the first degree and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Vitale, J.*; thereafter, the court denied the defendant's motions to preclude certain evidence; subsequently, verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, former state's attorney, *Seth R. Garbarsky*, senior assistant state's attorney, and *Andrew Reed Durham*, former assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, James Graham, appeals from the judgment of conviction, rendered after a jury trial, of one count each of felony murder, conspiracy to commit robbery in the first degree, and carrying a pistol without a permit. On appeal, the defendant claims that (1) the trial court erred in admitting the statement of an accomplice that inculpated the defendant, in violation of § 8-6 (4) of the Connecticut Code of Evidence and the defendant's sixth amendment right to confrontation, (2) the prosecutor committed impropriety by presenting a generic tailoring argument during closing argument, which violated the defendant's confrontation rights under our state constitution, and (3) the prosecutor committed impropriety by eliciting certain information contained in two witnesses' cooperation agreements and by presenting closing argument

State *v.* Graham

related to those materials. We affirm the judgment of conviction.

The jury reasonably could have found the following relevant facts. In 2017, the defendant and two of his friends, Robert Moye and Brennan Coleman, walked from the defendant's home in New Haven to the area where the Farmington Canal Heritage Trail (Canal Line Trail), a walking and bike path, intersects with Dudley Street in Hamden. Along the way, they observed Donavan Lowndes—a friend of Coleman's—driving along Dudley Street. Coleman flagged Lowndes down, and the three men approached Lowndes' vehicle, where they talked briefly. During their conversation, Coleman pulled out a semiautomatic pistol and showed it to Lowndes.

Moments later, the defendant, Moye, and Coleman observed the victim, Leandre Benton, walking along the Canal Line Trail. The defendant and his friends were members of "Read Street" and "Starr Block," allied groups in New Haven. The victim, however, was a member of "SLB," a rival group in Hamden. When they saw the victim, Coleman suggested, "let's go stain him," meaning they should rob him. They approached the victim and asked him whether he was "SLB." In response, the victim punched Coleman in the face. Coleman took out his gun to shoot the victim, but the gun jammed. The defendant then pulled out his .380 caliber pistol and fatally shot the victim. Following the shooting, the three men took money and a cell phone from the victim. They also took some of the victim's clothing and then fled the scene on foot.

Thereafter, Moye messaged his friend, Steven Capers, and asked him to pick him up in Hamden. Capers agreed. Shortly after Capers arrived, the defendant, Moye, and Coleman emerged from a backyard, running away from the direction of Dudley Street. They rushed

State *v.* Graham

into the back seat of Capers' car, leaving the doors open, and told Capers to "go." They appeared "out of breath," "nervous," and smelled like gunpowder. Capers sensed that "something was going on," and, having noticed that there was increased police activity in the area, he told the three men to get out of his car. The three exited the car and ran southbound. Moye then messaged Shyquan Bellamy, who picked up the defendant, Moye, and Coleman in New Haven and drove them to a location in Waterbury.

Later that same evening, Moye initiated a FaceTime call with Donald Harris, who was in the car with Capers. The defendant, Moye, and Coleman were all visible on the screen. They informed Harris and Capers that they were staying in Waterbury. During the call, the defendant, Moye, and Coleman were "flashing guns." Moye displayed a .38 caliber revolver, Coleman displayed a nine millimeter semiautomatic pistol, and the defendant displayed a .380 caliber pistol.

Approximately one week later, while the defendant was at the home of his friend, Jalen Bacote, Bacote mentioned that he had seen a post on Facebook about the victim's death. The defendant went on to recount the details of the incident, including that he shot the victim and that he, Moye, and Coleman then took money, a cell phone, and some clothes from the victim. Around the same time, Capers visited Moye. While they were smoking marijuana, in Moye's backyard, with Harris, Moye asked Capers to swear that he would not tell anyone what he was about to say. Capers agreed, and Moye proceeded to divulge certain details about the murder.

The state charged the defendant with one count each of felony murder, conspiracy to commit robbery in the first degree, and carrying a pistol without a permit. At trial, the state called, among other witnesses, Capers

and Bacote, who, pursuant to their cooperation agreements with the state, testified regarding the aforementioned conversations they had with Moye and the defendant, respectively. The defendant also testified in his own defense. Although the defendant admitted that he was at the scene of the murder, along with Moye and Coleman, he denied any involvement. According to the defendant, he, Moye, and Coleman walked to Dudley Street because Coleman was planning to meet someone there. Because that person never arrived, they began walking back toward the defendant's house and encountered the victim. The defendant explained that the victim called them over and asked for marijuana bags, which Coleman happened to be carrying. The defendant testified that, while Coleman and the victim began to engage in a drug transaction, someone wearing a black hooded sweat suit and a face covering came up from behind and aimed a gun at them. The defendant claimed that he yelled out and began running back toward Dudley Street. Moye and Coleman followed. He also said that he heard gun shots. The defendant claimed that, after the shooting, he, Moye, and Coleman went back to the defendant's house and then went to Waterbury to get guns. He confirmed that Bellamy gave them a ride to Waterbury but denied ever having encountered Capers that day or having entered his car. The defendant also denied that any of them were carrying guns at the time of the shooting and contended that the first time he saw anyone with a gun was when they obtained the guns in Waterbury. He also acknowledged that he, Moye, and Coleman approached Lowndes' car before they encountered the victim but claimed that Coleman had showed Lowndes a cell phone, not a gun.

Ultimately, at the conclusion of the trial, the jury found the defendant guilty as charged. The court sentenced the defendant to a total effective sentence of

State *v.* Graham

fifty-two years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

A

We begin with the defendant's challenge to the trial court's admission of Capers' testimony regarding Moye's statement to him about the murder. The following additional facts are relevant to our analysis. At trial, the prosecutor called Capers to testify. During Capers' direct examination, the prosecutor alerted the court that he anticipated that defense counsel would object to questions he intended to ask regarding a "dual inculpatory statement" that Moye had made to Capers after the murder. The prosecutor conducted a proffer examination of Capers outside the presence of the jury. In response to the prosecutor's questions, Capers explained that, approximately one week after the murder, Moye, Capers, and Harris were smoking marijuana in Moye's backyard. During that gathering, Moye made Capers "do a solemn . . . oath, like say on word of [his] son [that he] wasn't going to tell something" or, in other words, "swear to God [he would not] say nothing." Capers "told [Moye] to say the same thing," and they went on to exchange secrets. Moye divulged details about the murder to Capers. Specifically, Moye told Capers that, when he was walking with Coleman and the defendant on the Canal Line Trail, they saw the victim and decided to "stain" him. Moye explained that he, Coleman, and the defendant approached the victim and asked if he was "SLB." Moye stated that the victim then punched Coleman in the face, and Coleman, in turn, pulled out his gun, a "baby nine," and attempted to shoot the victim, but the gun jammed, so the defendant shot him with his .380 caliber pistol. Moye did not tell Capers whether he was carrying a gun, himself, or whether they actually stole anything from the victim.

State *v.* Graham

Defense counsel objected to the state's proffer, arguing that Moye's statement to Capers constituted inadmissible hearsay. Further, defense counsel argued that the statement could not be admitted as a statement against penal interest, an exception to the rule against hearsay, because it was "a very self-serving statement from Moye," insofar as "[h]e distanced himself from the whole process . . . ." The prosecutor, in turn, argued that Moye's statement to Capers did constitute a statement against penal interest. The prosecutor noted that Moye made the statement to Capers within one week of the murder, the person to whom Moye made the statement was a longtime friend, there was corroborating evidence in the case that supported Moye's statement, and the statement was against Moye's penal interest because he implicated himself in two felonies— robbery and felony murder—insofar as he was aware that Coleman and the defendant were armed with firearms and "that there was a likelihood that a death could result as a result of [the] robbery."

Ultimately, the trial court overruled defense counsel's objection to Capers' testimony and concluded that the statement was admissible as a statement against penal interest. Specifically, after finding that Moye was unavailable,[1] the court applied the test set forth in § 8-6 (4) of the Connecticut Code of Evidence to determine whether Moye's statement to Capers was sufficiently trustworthy to constitute a statement against penal interest. The court made the following findings: "A fair reading of [Moye's] statement, viewed through the lens of common sense, makes it abundantly clear that [his] statements . . . subject[ed] both [him] and the defen-

---

[1] The prosecutor told the court that Moye's attorney had informed the state that she would advise Moye to invoke his fifth amendment privilege against self-incrimination if called to testify, and that he had invoked the privilege in a prior probable cause hearing. Defense counsel agreed that Moye was unavailable to testify, and neither party, on appeal, disputes the trial court's finding that Moye was unavailable.

State *v.* Graham

dant to criminal liability; to wit, a conspiracy or plan
to rob the victim. . . . With regard to the factors, the
time that the statement was made, it was made only
one week following the commission of the crime. The
person to whom it was made, this witness, who, there's
evidence before the jury, is a longtime friend. They hung
out together almost on a daily basis, and the evidence
demonstrates that . . . Capers is a person in whom,
based on their relationship, [Moye] would be likely to
confide . . . . In fact, the testimony is that . . . Moye
made . . . Capers swear an oath not to repeat the
statement, and . . . Capers testified [that] he told
[Moye], in fact, a confidence in return. In terms of cor-
roboration of the evidence, there is the evidence before
the jury with regard to the state's exhibit, the video [of
the defendant, Moye, and Coleman walking to and from
the Canal Line Trail], which shows all these individuals
together. And the jury now knows, through the testi-
mony, if [the jury chooses] to accept it, from . . .
Lowndes, that at least one of them, as far as the jury
knows at this point, was armed. In terms of penal inter-
est, [*State* v.] *Azevedo*, [178 Conn. App. 671, 686, 176
A.3d 1196 (2017), cert. denied, 328 Conn. 908, 178 A.3d
390 (2018)], indicates that whether a statement is
against a declarant's penal interest is an objective
inquiry of law, rather than a subjective analysis of the
declarant's personal legal knowledge. Statements are
evaluated according to a reasonable [person] standard.
To the extent, if any, based on [defense counsel's] argu-
ment that it's self-serving, I don't think it's self-serving.
He . . . implicates himself in a plan to rob the victim.
. . . Moye's statements about himself, even if they were
neutral or even to some extent self-serv[ing], they are
still admissible. . . . And the statement certainly
[tends] to incriminate . . . Moye.'' (Citation omitted.)
Accordingly, Capers proceeded to testify before the jury
regarding Moye's admissions, consistent with the state's

State *v.* Graham

proffer. He also added that Moye "kept saying that they probably [were] going to get caught."

On appeal, the defendant contends that the trial court incorrectly concluded that the statement satisfied the dual inculpatory hearsay exception because the statement (1) was not truly against Moye's penal interest, in that it minimized Moye's role in the criminal conduct, while inculpating the defendant and Coleman, and (2) was not trustworthy. The state disagrees and argues that the trial court properly found that the statement at issue (1) was against Moye's penal interest, even though he did not portray himself as the actual shooter, and (2) was sufficiently trustworthy, under the factors set forth in § 8-6 (4) of the Connecticut Code of Evidence, to be admitted into evidence.

We begin with the standard of review and relevant legal principles. "The law regarding out-of-court statements admitted for the truth therein is well settled. An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Rivera*, 268 Conn. 351, 360, 844 A.2d 191 (2004). "Section 8-6 (4) of the Connecticut Code of Evidence carves out an exception to the hearsay rule for an out-of-court statement made by an unavailable declarant if the statement was 'trustworthy' and, 'at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true.' " Id., 361; see also, e.g., *State* v. *Patel*, 342 Conn. 445, 477, 270 A.3d 627 (2022), petition for cert. filed (U.S. August 18, 2022) (No. 22-155). Section 8-6 (4) further instructs that, "[i]n determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made

State *v.* Graham

and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest.'' Conn. Code Evid. § 8-6 (4). ''[N]o single factor . . . is necessarily conclusive . . . . Thus, it is not necessary that the trial court find that all of the factors support the trustworthiness of the statement. The trial court should consider all of the factors and determine whether the totality of the circumstances supports the trustworthiness of the statement.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Lopez*, 254 Conn. 309, 316, 757 A.2d 542 (2000).

In this case, the state offered Moye's statement to Capers as a dual inculpatory statement, which is ''a statement that inculpates both the declarant and a third party, in this case the defendant.'' *State* v. *Schiappa*, 248 Conn. 132, 145 n.15, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). We evaluate a dual inculpatory statement using the same criteria that govern the admission of a statement against penal interest. See, e.g., id., 153–54. ''Whether a statement is against a declarant's penal interests is an objective inquiry of law, rather than a subjective analysis of the declarant's personal legal knowledge. Under § 8-6 (4) [of the Connecticut Code of Evidence], we must evaluate the statements according to a reasonable person standard, not according to an inquiry into the declarant's personal knowledge or state of mind.'' *State* v. *Camacho*, 282 Conn. 328, 359, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). Moreover, ''it is not the fact that the declaration is against interest but the awareness of that fact by the declarant which gives the statement significance.'' (Internal quotation marks omitted.) *State* v. *Bryant*, 202 Conn. 676, 696, 523 A.2d 451 (1987). ''[W]hen viewing this issue through an evidentiary lens, we examine whether the trial court properly exercised its discre-

State *v.* Graham

tion." (Internal quotation marks omitted.) *State* v. *Camacho*, supra, 363.

We first consider whether Moye's statement was against his penal interest. The essential characteristic as to what is against penal interest is "the exposure to risk of punishment for a crime." (Internal quotation marks omitted.) *State* v. *Bryant*, supra, 202 Conn. 695–96. Here, Moye's statement exposed him to a risk of punishment for conspiracy to commit robbery, robbery, and felony murder. As the trial court noted, Moye implicated himself in a plan to rob the victim. Moye also told Capers that he was aware that Coleman and the defendant were armed with firearms and, therefore, was aware that there was a likelihood that death could result during the commission of the robbery. He also admitted that he was present when the defendant shot and killed the victim. Moye, therefore, admitted his participation in a robbery that gave rise to a homicide and exposed himself to the possibility of a charge of felony murder. See General Statutes § 53a-54c. Accordingly, we conclude that Moye's statement was against his penal interest.

To the extent that Moye attempted to minimize his participation in the homicide by stating that the defendant was the one who shot the victim, we find this court's decision in *State* v. *Rivera*, supra, 268 Conn. 351, instructive. In *Rivera*, we held that the declarant in that case "admitted his participation in a burglary that had given rise to a homicide, and thus exposed himself to the possibility of a charge of felony murder. As the trial court correctly noted, even if [the declarant's] statement had attempted to minimize his participation in the homicide, the minimization would have been limited to 'one type of murder versus another type of murder.' The statement further implicated [the declarant] as a principal in the crime of burglary, and an accomplice in the crimes of arson and tampering

State *v.* Graham

with evidence. Therefore, [the declarant's] statement exposed him to potential liability for the same types of crimes with which the defendant has been charged and, accordingly, the statement fully and equally implicated both [the declarant] and the defendant.'' (Footnote omitted.) Id., 368. Similarly, here, to the extent that the defendant argues that Moye's statement was intended to distance Moye from the murder or to minimize his participation in the crime, we conclude—as was the case in *Rivera*—that Moye's statement was indeed inculpatory, as it exposed him to potential criminal liability for the same types of crimes with which the defendant was charged. A difference in degree of inculpation, rather than in kind, does not affect the conclusion that it is still an inculpatory statement.

We also find it significant that Moye requested that Capers undertake ''a solemn . . . oath'' before divulging the details of the murder. This ''oath,'' coupled with the fact that Moye repeatedly told Capers ''that they probably [were] going to get caught,'' bolsters the conclusion that Moye was aware that the statement was against his penal interest. See, e.g., *State* v. *Camacho*, supra, 282 Conn. 360–61; see also, e.g., *State* v. *Rivera*, supra, 268 Conn. 368–69 (fact that declarant drove to remote location before making inculpatory statement, told nephew that he and defendant had done something wrong, and admonished nephew not to repeat statement indicated that declarant ''reasonably could have foreseen that the statement was against his penal interest'').

The defendant nevertheless contends that, short of excluding the entire statement, the trial court should have admitted only those portions of the statement in which Moye explicitly inculpated himself in the crime. Specifically, he contends that Moye's statement ''that the defendant took out his gun and shot the victim is a non-self-inculpatory statement contained in an overall

State *v.* Graham

broader narrative.'' To that end, he argues that we should reject the approach to statements against penal interest that we adopted in *State* v. *Bryant*, supra, 202 Conn. 696–97, namely, that, ''[when] the disserving parts of a statement are intertwined with self-serving parts, it is more prudential to admit the entire statement and let the trier of fact assess its evidentiary quality in the complete context,'' and, instead, follow the United States Supreme Court's decision in *Williamson* v. *United States*, 512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994). In *Williamson*, the United States Supreme Court interpreted the analogous federal rule to § 8-6 (4) of the Connecticut Code of Evidence, rule 804 (b) (3) of the Federal Rules of Evidence, and concluded that ''the most faithful reading of [that rule] is that it does not allow [the] admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.'' Id., 600–601.

Because we conclude that Moye's entire statement, including those specific portions naming the defendant as the shooter, was self-inculpatory, we need not decide whether to adopt the approach taken by *Williamson*. See, e.g., *State* v. *Rivera*, supra, 268 Conn. 371 n.18 (concluding that codefendant's entire statement was self-inculpatory, including any portions that were designed to minimize codefendant's participation in crime). Indeed, although Moye identified the defendant as the actual shooter, Moye also directly and explicitly incriminated himself by admitting his own participation in the plan to commit a robbery that gave rise to the murder. Moreover, even if Moye's statement served as an attempt to minimize his participation in the actual homicide, the statement still implicated him in the murder and exposed him to potential liability for the same types of crimes with which the defendant was charged. See, e.g., *State* v. *Camacho*, supra, 282 Conn. 360 (codefendant's statements were not blame shifting because they

State *v.* Graham

exposed him to potential liability for same crimes with which defendant was charged, thereby implicating codefendant and defendant equally); *State* v. *Azevedo*, supra, 178 Conn. App. 685–88 (statements were against penal interest when declarant, who was accessory to defendant's crimes, stated that defendant was responsible for setting house on fire and detailed how defendant set fire that destroyed home).

We also note an important factual distinction that differentiates this case from *Williamson*. In *Williamson*, the United States Supreme Court was required to determine whether an accomplice's confession to the United States Drug Enforcement Administration, which inculpated the defendant, was admissible pursuant to rule 804 (b) (3) of the Federal Rules of Evidence. See *Williamson* v. *United States*, supra, 512 U.S. 596–98. The court was largely concerned with the reliability of a codefendant's postarrest statements made to authorities, particularly those that inculpated or shifted blame to the defendant. See id., 603; see also, e.g., *United States* v. *Ebron*, 683 F.3d 105, 134 n.9 (5th Cir. 2012) (determining that, although court in *Williamson* pronounced broad rule, "its analysis is predicated on the assumption that the challenged statement was a [postarrest] confession"), cert. denied, 571 U.S. 989, 134 S. Ct. 512, 187 L. Ed. 2d 365 (2013).[2] Although the court in

---

[2] The defendant relies on *State* v. *Britt*, 293 Neb. 381, 881 N.W.2d 818 (2016), a case decided by the Nebraska Supreme Court, in support of his argument that Moye's statement should not have been admitted in its entirety. In *Britt*, the court determined that certain statements made by the declarant, a codefendant, were inadmissible as statements against penal interest. Id., 422. The court concluded that, although the statements were partially inculpatory because they implicated the declarant in the plan to rob the victim, they were not sufficiently against the declarant's penal interests because the declarant shifted blame to the defendant "for the fact that a robbery turned into a triple homicide." Id. Although the facts of *Britt* bear some similarity to this case, we find the Nebraska Supreme Court's analysis unpersuasive, primarily because it is predicated on what we consider to be a broad interpretation of *Williamson*, an interpretation that has been questioned by other courts; see, e.g., *United States* v. *Lovato*, 950 F.3d 1337,

State *v.* Graham

*Williamson* broadly pronounced that rule 804 (b) (3) of the Federal Rules of Evidence "does not allow [the] admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory"; *Williamson* v. *United States*, supra, 600–601; it nevertheless expressly recognized that an inculpatory statement may be admitted under the rule if "the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true . . . [which is a] question [that] can only be answered *in light of all the surrounding circumstances*." (Emphasis added; internal quotation marks omitted.) Id., 603–604. In our view, which is reflected in our own Code of Evidence; see Conn. Code Evid. § 8-6 (4); one important, and informative, "surrounding circumstance" is the party to whom the declaration was made. Indeed, the advisory committee note to rule 804 (b) (3) of the Federal Rules of Evidence, relied on by United States Supreme Court Justice Anthony M. Kennedy in his concurrence in *Williamson*; see *Williamson* v. *United States*, supra, 614–15 (Kennedy, J., concurring in the judgment); provides in relevant part: "[A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest. . . . *On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying* [as a statement against interest]." (Citation omitted; emphasis added.) Fed. R. Evid. 804 (b) (3), advisory committee note. In this case, Moye's statement was not made to law enforcement agents, and, thus, the fear that his statement was made to shift blame to the defendant

1342 (10th Cir. 2020), cert. denied,      U.S.     , 141 S. Ct. 2814, 210 L. Ed. 2d 939 (2021); *United States* v. *Ebron*, supra, 683 F.3d 134 n.9.

State *v.* Graham

and curry favor with law enforcement is not present. Indeed, as we explain in detail subsequently in this opinion, the circumstances under which Moye made the statement—in a casual setting to a longtime friend— strongly support the statement's reliability and, thus, its admissibility.

The application of the foregoing principles leads us to conclude that the trial court did not abuse its discretion in determining that Moye's statement was against his penal interest. Having so concluded, we turn next to the remaining factors under the trustworthiness component of our inquiry, namely, "(A) the time the statement was made and the person to whom the statement was made, [and] (B) the existence of corroborating evidence in the case . . . ." Conn. Code Evid. § 8-6 (4).

With regard to the first factor, we conclude that the circumstances under which Moye made his statement to Capers were strongly indicative of its reliability. "In general, declarations made soon after the crime suggest more reliability than those made after a lapse of time [when] a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 70, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). Here, the trial court found that Moye's statement to Capers was made only one week after the crimes took place. This narrow time frame supported the trial court's finding that the statement was reliable. See, e.g., *State* v. *Camacho*, supra, 282 Conn. 361 (statements made approximately one week after crime were trustworthy); *State* v. *Pierre*, supra, 70–72 (statements made within "couple of weeks" of crime were trustworthy); *State* v. *Rivera*, supra, 268 Conn. 370–71 (statements made within five months of crime were trustworthy).

Additionally, Moye made the contested statement of his own volition, to people with whom he had a close

State *v.* Graham

relationship, during a casual encounter in his backyard.
Capers testified that he had known Moye for six or
seven years and that he, Harris, and Moye were all part
of a group who regularly hung out together. It is well
settled that statements made to friends and close associ-
ates "are significantly more trustworthy than state-
ments obtained by government agents for the purpose
of creating evidence that would be useful at a future
trial. . . . In short, neither facing arrest nor being
under arrest when making his statements to [the wit-
ness], [the declarant] lacked the obvious incentive to
shift blame or curry favor with the police. . . . Addi-
tionally, although [the witness] was not a relative of
[the declarant] . . . a factor that we have previously
noted when evaluating whether a statement is trustwor-
thy, the trial court specifically found that [the witness]
was far from a stranger . . . . [T]he fact remains that
they shared a friendship and a relationship of trust."
(Citations omitted.) *State* v. *Pierre*, supra, 277 Conn.
70; see also, e.g., *State* v. *Camacho*, supra, 282 Conn.
362; *State* v. *Rivera*, supra, 268 Conn. 369; *State* v.
*Bryan*, 193 Conn. App. 285, 305 n.15, 219 A.3d 477, cert.
denied, 334 Conn. 906, 220 A.3d 37 (2019). We therefore
conclude that the fact that Moye made the contested
statement in a noncoercive atmosphere to a person
with whom he had a close relationship further supports
the statement's reliability and weighs in favor of admis-
sibility.[3]

_____

[3] The defendant argues that Moye, by naming the defendant as the shooter,
"could have been more concerned about [retaliation] from rival gang mem-
bers . . . . By placing the blame of the shooting on the [defendant and
Coleman], Moye may have been attempting to get word on the street that
the others shot the victim, not him." Aside from the lack of evidence in the
record to support this theory, the defendant has not cited any cases, and
we have found none, in which we have concluded that a statement made
in such a circumstance is unreliable. Indeed, our case law supports the
proposition that statements made to acquaintances in casual settings, rather
than to law enforcement while inside "the coercive atmosphere of official
interrogation," tend to be more reliable, as the declarant "lack[s] the obvious
incentive to shift blame or curry favor with the police." (Internal quotation

State *v.* Graham

The defendant nevertheless contends that the circumstances in which Moye made his statement are "no different" from the circumstances in which the declarant made a statement in *State* v. *Boyd*, 214 Conn. 132, 570 A.2d 1125 (1990), which we held were not trustworthy. See id., 140. We disagree. In *Boyd*, the defendant was charged with felony murder and first degree burglary, among other crimes. Id., 133. The only evidence offered by the state to implicate the defendant in the victim's murder was a written statement made by the codefendant, Tyrone Wilson. Id., 134. This court held that the statement was inadmissible on evidentiary grounds because it "was made to the police while Wilson was in custody." Id., 140. We cautioned that such statements, made against a codefendant by a third party in police custody, often lack sufficient indicia of reliability, considering "there [exist] obvious motives for falsification—the very natural desire to curry favor from the arresting officers, the desire to alleviate culpability by implicating others, the enmity often generated in a conspiracy gone awry, the desire for revenge, all [of which] might lead an arrestee-declarant to misrepresent or to exaggerate the role of others in the criminal enterprise." (Internal quotation marks omitted.) Id., 139–40. Furthermore, "no evidence was offered [at the probable cause hearing] that corroborated Wilson's statement to the extent that it implicated the defendant in [the victim's] murder." Id., 140.

This case is clearly distinguishable from *Boyd*. Here, Moye's statement was not made during police interrogation, and, thus, there was no such "obvious [motive] for falsification," namely, "the very natural desire to curry favor from the arresting officers . . . ." (Internal quotation marks omitted.) Id. Furthermore, as we

marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 70; see, e.g., *State* v. *Bonds*, 172 Conn. App. 108, 125, 158 A.3d 826, cert. denied, 326 Conn. 907, 163 A.3d 1206 (2017).

State *v.* Graham

explain hereinafter, there was evidence adduced at trial that corroborated Moye's account insofar as it implicated the defendant in the murder. As our Appellate Court aptly stated, ''*Boyd* does not create a blanket rule of inadmissibility of all declarations against penal interest when they are inculpatory as to both the declarant and the defendant. Instead, based [on] the traditional analysis of trustworthiness, such statements are inadmissible when made after the crime is complete and *when made in a custodial environment to a custodian such as a law enforcement officer*.'' (Emphasis added.) *State* v. *Lynch*, 21 Conn. App. 386, 396, 574 A.2d 230, cert. denied, 216 Conn. 806, 580 A.2d 63 (1990). Far from giving a statement in a custodial environment to law enforcement, Moye made his statement during a casual backyard gathering to a longtime friend. Thus, we conclude that the first factor strongly weighs in favor of the statement's trustworthiness.

With regard to the second factor, there was other evidence presented at trial that corroborated the trustworthiness of Moye's statement. The trial court expressly relied on the fact that video surveillance captured Moye, Coleman, and the defendant in the vicinity immediately before and after the shooting. Further, the jury heard testimony from Lowndes that, prior to their encounter with the victim, either the defendant, Moye, or Coleman was armed, as Coleman showed Lowndes a gun after approaching his car. In addition to the evidence on which the trial court explicitly relied, additional, independent evidence adduced at trial further corroborated Moye's statement. Moye's account was consistent with the physical evidence; Moye told Capers that the defendant used a .380 caliber pistol, which was corroborated by the .380 caliber bullet recovered from the victim's body during his autopsy. Additionally, Moye accurately recounted the nature of the victim's head wound, as Capers testified that Moye told him that the bullet had

State *v.* Graham

passed through the victim's head, and the autopsy showed that the bullet had entered the mid-front of the victim's head, passed through his cranium, and exited near his left ear. Moye's testimony was also consistent with the defendant's account of the events surrounding the murder, as relayed to the jury through Bacote's trial testimony. The existence of this corroborating evidence also supports the statement's reliability and weighs in favor of its admissibility.

In sum, in light of the inculpatory nature of the statement, the fact that the statement was made only one week after the crime during a casual encounter in Moye's backyard, and the existence of corroborating evidence presented at trial that supported the statement's trustworthiness, we conclude that the trial court did not abuse its discretion when it admitted Moye's dual inculpatory statement to Capers under § 8-6 (4) of the Connecticut Code of Evidence.

B

We next address whether the admission of Moye's statement violated the defendant's sixth amendment right to confrontation.[4] At the outset, we note that the defendant makes only cursory reference to his sixth amendment right in his brief and does not separately analyze this constitutional claim from his evidentiary claim. Indeed, he does not cite or apply the controlling standard set forth by the United States Supreme Court in *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), or its progeny, *Davis* v. *Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L.

---

[4] The sixth amendment right to confrontation is made applicable to the states by incorporation through the due process clause of the fourteenth amendment to the United States constitution. E.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

The defendant does not raise a state constitutional claim in this regard. Accordingly, we have no occasion to consider whether our state constitution affords greater protection than the federal constitution.

State *v.* Graham

Ed. 2d 224 (2006). Nevertheless, to the extent that this unpreserved claim was adequately briefed, we conclude that Moye's statement was nontestimonial, and its admission, therefore, did not violate the defendant's confrontation rights.

The defendant did not raise his sixth amendment claim at trial and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40; see *In re Yasiel R.*, supra, 781 (modifying third prong of *Golding*). Because the record is adequate for review, and the defendant's claim, which alleges a violation of his sixth amendment right to confrontation, is of constitutional magnitude, our inquiry focuses on whether the violation alleged by the defendant exists.

As we have explained: "Beyond [the previously mentioned] evidentiary principles, the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. . . . The [c]onfrontation [c]lause . . . bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 75.

State *v.* Graham

In *Crawford*, the United States Supreme Court "drew a distinction between testimonial hearsay statements and those deemed nontestimonial." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 76. "Under *Crawford* . . . the hearsay statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. Hearsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Holley*, 327 Conn. 576, 585 n.5, 175 A.3d 514 (2018).

Since the United States Supreme Court's decision in *Crawford*, the court has formulated a "primary purpose" test for determining whether a statement is testimonial in nature. *Davis* v. *Washington*, supra, 547 U.S. 822. The primary purpose test directs courts to consider "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of [a given] conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio* v. *Clark*, 576 U.S. 237, 245, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015), quoting *Michigan* v. *Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). Accordingly, this court applies a primary purpose test for evaluating whether a statement is testimonial. See, e.g., *State* v. *Sinclair*, 332 Conn. 204, 225, 210 A.3d 509 (2019). Additionally, we have consistently applied the rule that, in determining a declarant's primary purpose in making a statement, courts must consider "the formality attendant to the making of the statement . . . ." Id.; see also *Ohio* v. *Clark*, supra, 245, 247; *Michigan* v. *Bryant*, supra, 366, 377; *State* v. *Patel*, supra, 342 Conn. 462, 464–65.

A review of our case law in this area persuades us that Moye's statement was nontestimonial, and, there-

fore, its admission did not violate the defendant's confrontation rights. See, e.g., *Ohio* v. *Clark*, supra, 576 U.S. 245 ("[A] statement cannot fall within the [c]onfrontation [c]lause unless its primary purpose was testimonial. [When] no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the [c]onfrontation [c]lause." (Internal quotation marks omitted.)). Moye's statement to Capers inculpating himself and the defendant was not made under circumstances that would "lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *State* v. *Rivera*, supra, 268 Conn. 365. In particular, Moye's statement was made in an informal setting, in his own backyard, and on his own initiative to his friend, before anyone had been charged. See, e.g., *State* v. *Pierre*, supra, 277 Conn. 77–78 (determining that declarant's statements were nontestimonial because statements were made on declarant's "own initiative, to a friend whom he had known for several years, nearly six months before either he or the defendant [was] arrested for the crime"); *State* v. *Rivera*, supra, 365 (concluding that statement was nontestimonial because declarant "made the statement in confidence and on his own initiative to a close family member, almost eighteen months before the defendant was arrested and more than four years before his own arrest"). Accordingly, we conclude that Moye's statement to Capers was nontestimonial, and its admission at trial did not violate the defendant's sixth amendment right to confrontation. The defendant's unpreserved constitutional claim therefore fails under *Golding*'s third prong.

II

We next address the defendant's claim that the prosecutor committed impropriety by presenting a generic tailoring argument during closing argument when he suggested that the jury should discredit the defendant's

State *v.* Graham

testimony because the defendant testified after "hear-
[ing] all the testimony." The defendant contends that
this argument violated his confrontation rights under
article first, § 8, of the state constitution.

The following additional facts are relevant to our
analysis. During his closing argument, the prosecutor
summarized the defendant's testimony as follows: "[The
defendant] indicate[d] that [the person who shot the
victim] wasn't him. It was a masked man in a track suit
who came in from somewhere, not anywhere on camera
. . . but from somewhere in the trees, and aimed this
gun at them and fired." The prosecutor proceeded to
replay a video, which was shown during the course of
trial, of the defendant, Moye, and Coleman running
away from the scene after the victim was shot. The
prosecutor then asked: "Do you see any of those men
duck? Do you see any of them scatter, dive behind a
car, get behind a tree, try to get anywhere away from
the shooter? Do you see them running with arms pump-
ing like an Olympic sprinter, or do they have their hands
in their pockets, jogging, like they are trying to get away
from a crime scene?"

The prosecutor then returned to the defendant's ver-
sion of events. He argued: "The defendant sat here
throughout the course of the trial. He heard all the
testimony. And, I'd submit to you, he had an opportunity
to decide which pieces of evidence he wanted to dis-
agree with and which pieces of evidence he was going
to concede. He heard his own mother come in here and
testify that it was him on the camera on Goodrich Street
[in Hamden]. His own mother identifies him from a
[photograph] at the very head of the Canal Line [Trail].
So, he admits it's him. We have [global positioning sys-
tem (GPS)] records . . . showing him leaving his
house at 3:24 [p.m.] and getting back there twenty-two
minutes later. He can't dispute those electronic records,
so he concedes it. . . . Bellamy, he didn't have a dog

State *v.* Graham

in this fight. He comes in and says, 'yeah, I gave some guys a ride.' The defendant can't dispute that, so he concedes it. It says 'Waterbury' on the video in . . . Moye's phone. There's a [photograph] of him, two days prior, pulling a weapon. He can't dispute that, so he says, 'I don't know the caliber of that gun.' But . . . Capers and . . . Bacote know the caliber of that gun, and [it] was a .380. So, the one portion of the evidence [for which] the defendant has an opportunity to give a piece of information—it can't easily be challenged because it's not on camera—is the [moment] of the shooting. So, the [moment] of the shooting, he tells you the story that we've been talking about. That, just by happenstance, the exact [moment when] he . . . Coleman, and . . . Moye are walking up to [the victim], there is a masked man in a track suit who aims at them, fires at them without provocation, just by coincidence.''

The defendant's claim on appeal rests on two predicates, both of which must be satisfied in order for him to prevail. First, the defendant argues that the prosecutor made a generic tailoring argument in two particular portions of the closing argument. In the first instance, the prosecutor said: ''The defendant sat here throughout the course of the trial. He heard all the testimony. And, I'd submit to you, he had an opportunity to decide which pieces of evidence he wanted to disagree with and which pieces of evidence he was going to concede.'' In the second instance, the prosecutor argued: ''So, the one portion of the evidence [for which] the defendant has an opportunity to give a piece of information—it can't easily be challenged because it's not on camera— is the [moment] of the shooting. So, the [moment] of the shooting, he tells you the story that we've been talking about.'' Second, the defendant argues that, although permissible under the federal constitution, generic tailoring arguments violate the right to confrontation guaranteed by article first, § 8, of the state consti-

State *v.* Graham

tution, which, according to the defendant, provides broader protections than the federal constitution. The state argues, however, that the contested portions of the prosecutor's closing argument constituted a specific, rather than generic, tailoring argument, which this court has held is permissible. Therefore, the state argues, this court has no occasion to consider whether generic tailoring arguments are impermissible under the state constitution. We agree with the state.

Defense counsel did not object to the prosecutor's closing argument at trial, and the defendant therefore seeks review of his unpreserved claim under *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781. See part I B of this opinion. Because the record is adequate for review and the defendant alleges a violation of a state constitutional right, we must determine whether the alleged violation exists.

"A prosecutor makes a tailoring argument when he or she attacks the credibility of a testifying defendant by asking the jury to infer that the defendant has fabricated his testimony to conform to the testimony of previous witnesses. . . . The term most frequently is used to refer to a prosecutor's direct comment during closing argument on the defendant's opportunity to tailor his testimony, although a prosecutor sometimes also will use cross-examination to convey a discrediting tailoring message to the jury. There are two types of tailoring arguments: generic and specific. The former occurs when the prosecutor argues the inference solely on the basis of the defendant's presence at trial and his accompanying opportunity to fabricate or tailor his testimony. . . . A specific tailoring argument, by contrast, occurs when a prosecutor makes express reference to the evidence, from which the jury might reasonably infer that the substance of the defendant's tes-timony was fabricated to conform to the state's case

State *v.* Graham

as presented at trial.'' (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531, 543–44, 212 A.3d 208 (2019).

In *State* v. *Cassidy*, 236 Conn. 112, 120, 125–29, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), this court first addressed the constitutionality of tailoring arguments. We concluded that generic tailoring arguments violate a criminal defendant's sixth amendment right to confrontation; id., 125, 128–29; but specific tailoring arguments are constitutionally permissible because such arguments are ''linked solely to the evidence and not, either directly or indirectly, to the defendant's presence at trial.'' Id., 128 n.17. Four years later, however, the United States Supreme Court released its decision in *Portuondo* v. *Agard*, 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000), in which it held that generic tailoring arguments do not violate any federal constitutional rights. Id., 70–71, 73.

The United States Supreme Court's decision in *Portuondo* required us to overrule *Cassidy*, which we did in *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000). In *Alexander*, this court noted that, to the extent that the defendant, through supplemental briefing, raised a claim that generic tailoring arguments violate our state constitution, this court was ''not persuaded by his argument.'' Id., 296 n.9. Recently, in *State* v. *Weatherspoon*, supra, 332 Conn. 531, a defendant claimed on appeal to this court that the prosecutor's generic tailoring arguments violated his right to confrontation guaranteed by article first, § 8, of the Connecticut constitution. See id., 547. After closely examining the evidentiary record in that case, however, we concluded that the contested statements constituted specific, rather than generic, tailoring. See id., 548–49. In light of that conclusion, we did not decide whether our state constitution provides broader protection

State *v.* Graham

against generic tailoring arguments than does the federal counterpart. Id., 550.

In determining whether a tailoring comment is specific or generic, "we must view [the] statement in context to determine the true nature of the prosecutor's argument." Id., 549. In this case, immediately preceding the first contested statement—that "[t]he defendant sat here throughout the course of the trial. He heard all the testimony. And, I'd submit to you, he had an opportunity to decide which pieces of evidence he wanted to disagree with and which pieces of evidence he was going to concede"—the prosecutor summarized the defendant's version of events, then played a surveillance video that showed the defendant, Moye, and Coleman leaving the scene of the crime. The prosecutor suggested that the defendant's version of events was tailored to fit the evidence showing that he and his compatriots were captured on video leaving the scene of the crime, a fact that required him to fabricate a story about a masked gunman. The prosecutor then argued that the defendant's story was demonstrably false because his version—that an unnamed, masked assailant shot at the victim—was inconsistent with the video surveillance, which did not show the men ducking, hiding, or taking cover, as one would expect a person to do when faced with an armed assailant.

In the portion of argument between the two contested statements, the prosecutor noted that the defendant agreed with the state only with respect to those elements of his story that were established by indisputable evidence, namely, the GPS data, surveillance imaging, and electronic records. The prosecutor urged the jury to evaluate the defendant's credibility by reference to his behavior in the surveillance video, GPS records, which recorded the time at which the defendant left and returned to his home, and the testimony of the defendant's mother, Bellamy, Capers, and Bacote. He

State *v.* Graham

went on, in the second contested statement, to suggest that the defendant fabricated the only thing with which there was no irrefutable evidence to support—the true identity of the person who shot the victim.

Although the state's tailoring theory could have been conveyed with more precise reference to the evidence, the prosecutor's argument contained several evidence-based assertions. First, the defendant's account that a masked assailant began shooting at him was inconsistent with his behavior in the surveillance video, which supports the inference that his in-court testimony was fabricated to conform to the evidence. Second, the nearly identical accounts from Capers and Bacote, describing the plan of the defendant, Moye, and Coleman, sharply diverged from the defendant's in-court testimony, which supports the inference that the defendant's version of events was likewise fabricated. Finally, the evidence, including video surveillance, GPS imaging, and electronic records confirming the fact that Bellamy drove the defendant, Moye, and Coleman to Waterbury, supports the inference that the defendant conformed his version of events to the indisputable evidence and fabricated the testimony regarding the presence of an unknown masked assailant. These evidence-based assertions distinguish this specific tailoring argument from a generic tailoring argument. Cf. *Portuondo* v. *Agard*, supra, 529 U.S. 64, 70–71 (The prosecutor made generic tailoring argument when she remarked: "You know, ladies and gentlemen, unlike all the other witnesses in this case the defendant has . . . the benefit . . . to sit here and listen to the testimony of all the other witnesses before he testifies. . . . That gives you a big advantage, doesn't it? You get to sit here and think what am I going to say and how am I going to say it? How am I going to fit it into the evidence? . . . He's a smart man. I never said he was stupid. . . . He used everything to his advantage." (Internal quotation marks

State *v.* Graham

omitted.)); *Martinez* v. *People*, 244 P.3d 135, 142 (Colo. 2010) (prosecutor made generic tailoring arguments when she suggested that defendant was "able to sit in here the whole time and listen to what everybody had to say" and "was able to tailor his statement with what everybody else had to say because he's been [in court]" but failed to tie tailoring arguments to evidence in record (internal quotation marks omitted)).

We therefore conclude that the challenged tailoring comments were specific, rather than generic, because the suggestion of tailoring was tied to evidence that, if credited by the jury, could have supported the prosecutor's claims. See, e.g., *State* v. *Weatherspoon*, supra, 332 Conn. 549–50 (because prosecutor's statement that defendant's testimony "was entirely self-serving with the benefit of hearing all the testimony that came before" was supported by explicit evidence that could lead to reasonable inference of tailoring, it was specific tailoring argument (emphasis omitted; internal quotation marks omitted)); see also *State* v. *Mattson*, 122 Haw. 312, 327, 226 P.3d 482 (2010) (because prosecutor referred to specific evidence presented at trial, in addition to referring to defendant's presence at trial, court concluded that it could not "be said that the prosecutor's remarks during closing argument constituted a 'generic accusation' that [the defendant] tailored his testimony based *solely* on his presence at trial" (emphasis in original)).[5] Accordingly, we also conclude that the

_____

[5] In support of his generic tailoring claim, the defendant relies on *State* v. *Daniels*, 182 N.J. 80, 861 A.2d 808 (2004). In *Daniels*, the Supreme Court of New Jersey exercised its supervisory authority to prohibit generic tailoring arguments and to constrain a prosecutor's ability to make specific tailoring arguments. With regard to specific tailoring, the court explained that the prosecutor's comments were "precisely the type that a prosecutor is prohibited from making, *even when the record indicates that* [*the*] *defendant tailored his testimony.*" (Emphasis added.) Id., 101. We are not persuaded.

First, the defendant does not ask us to exercise our supervisory authority to place similar constraints on specific tailoring arguments. Recently, in *Weatherspoon*, we declined the defendant's request to exercise our supervisory authority and to reverse the judgment of conviction and create a rule

State *v.* Graham

prosecutor's comments did not violate the defendant's right to confrontation under the state constitution. In light of this conclusion, we need not resolve the defendant's contention that our state constitution affords greater protection against generic tailoring arguments than does the federal constitution.

III

Finally, we turn to the defendant's second claim of prosecutorial impropriety. Specifically, the defendant claims that the prosecutor improperly elicited certain information contained in the cooperation agreements of two of the state's witnesses, Capers and Bacote, and improperly presented closing argument related to those materials. The state contends that the defendant erroneously attempts to recast routine claims of alleged evidentiary error as claims of prosecutorial impropriety. Because the defendant did not challenge the trial court's evidentiary rulings admitting the testimony regarding Capers' and Bacote's cooperation agreements on appeal, the state argues that the defendant's evidentiary claim is unreviewable. We agree with the state.

Our courts have recognized that it is usually not impropriety for a prosecutor to ask a question that may elicit objectionable testimony, let alone one—as in this case—that garners an objection that the trial court overrules, in favor of the prosecution. See, e.g., *State* v. *Holmes*, 169 Conn. App. 1, 15, 148 A.3d 581 ("simply posing an objectionable question does not amount to an actionable impropriety"), cert. denied, 323 Conn. 951, 151 A.3d 847 (2016); see also *State* v. *Garcia*, 7 Conn. App. 367, 374, 509 A.2d 31 (1986); cf. *State* v.

prohibiting generic tailoring arguments. See *State* v. *Weatherspoon*, supra, 332 Conn. 553 ("we do not disapprove of specific tailoring arguments when they are warranted by the evidentiary record"). Second, in *Weatherspoon*, we did nothing to suggest such a narrow view of specific tailoring; nor did we purport to adopt the rule announced by the New Jersey Supreme Court in *Daniels*.

State *v.* Graham

*Rowe*, 279 Conn. 139, 151–52, 900 A.2d 1276 (2006) (defendant's claim was premised on propriety of prosecutor's questioning on subject of consciousness of guilt, rather than on alleged prosecutorial impropriety, and claim, therefore, must be considered evidentiary rather than constitutional). Moreover, "[a]rguing on the basis of evidence explicitly admitted [by the trial court] for that purpose cannot constitute prosecutorial [impropriety]." *State* v. *Rowe*, supra, 152. In this case, during closing argument, the prosecutor merely commented on evidence that the court explicitly allowed during the course of Capers' and Bacote's respective testimonies. This certainly was not improper.

As a result, we conclude that the defendant's claim regarding Capers' and Bacote's cooperation agreements is an unpreserved evidentiary claim masquerading as a claim of prosecutorial impropriety. It is well settled that we will not review such a claim. See, e.g., *State* v. *Golding*, supra, 213 Conn. 241; see also, e.g., *State* v. *Rowe*, supra, 279 Conn. 151–52. Furthermore, to the extent that the defendant contends in his reply brief that the trial court abused its discretion in admitting Capers' and Bacote's testimony regarding the cooperation agreements, we decline to address this claim because the defendant failed to raise it in his main brief. See, e.g., *State* v. *Devalda*, 306 Conn. 494, 519 n.26, 50 A.3d 882 (2012) (declining to review claim "because it is well settled that claims that are not raised in parties' main briefs, but instead are raised for the first time in reply briefs, ordinarily are considered abandoned").

The judgment is affirmed.

In this opinion ROBINSON, C. J., and MULLINS, KAHN and KELLER, Js., concurred.


ECKER, J., with whom D'AURIA, J., joins, concurring. I agree without reservation in all respects with the well

State *v.* Graham

reasoned majority opinion, except for part I A, as to which I concur in the judgment only. With respect to part I A, I am constrained to agree with the majority that the hearsay statement of the defendant's accomplice properly was admitted into evidence as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence,[1] pursuant to *State* v. *Rivera*, 268 Conn. 351, 844 A.2d 191 (2004). We held in *Rivera* that, as a result of the felony murder rule, an accomplice's dual inculpatory hearsay statements[2] that minimize the declarant's participation in the death of a victim nonetheless are "fully and equally" inculpatory and, thus, are admissible as statements against penal interest because the minimization is "limited to one type of murder versus another type of murder." (Internal quotation marks omitted.) Id., 368. The defendant, James Graham, has not asked us to overrule *Rivera*, and, therefore, we are bound to apply its holding to the facts of the present case. I write separately to explain why, in my view, we may wish to reconsider this portion of our holding in *Rivera* in a future case.

The majority opinion accurately sets forth the relevant facts pertaining to the out-of-court statement of the defendant's accomplice, Robert Moye. Approximately one week after the murder of the victim, Leandre Ben-

---

[1] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . . (4) A trustworthy statement against penal interest that, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In determining the trustworthiness of a statement against penal interest, the court shall consider (A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest. . . ."

[2] "A dual inculpatory statement is a statement that inculpates both the declarant and a third party, in this case the defendant." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 361 n.12.

State *v.* Graham

ton, Moye allegedly confessed his involvement in the underlying criminal activity to his friend, Steven Capers. Moye explained to Capers that he was walking along a biking and walking trail in Hamden with the defendant and Brennan Coleman when the three men decided to rob the victim. According to Moye, the victim punched Coleman in the face, and the defendant shot the victim with a .38 caliber pistol. Moye was unavailable to testify at trial, and the trial court admitted Capers' testimony regarding Moye's out-of-court statement under the statement against penal interest exception to the hearsay rule. See Conn. Code Evid. § 8-6 (4).

The issue on appeal is whether Moye's out-of-court statement properly was admitted under § 8-6 (4) of the Connecticut Code of Evidence, even though a portion of Moye's statement blamed the defendant for the murder of the victim. It is clear that Moye's statement is hearsay because it is an out-of-court statement admitted for the truth of the matter asserted. It is also clear that a portion of Moye's statement was against his penal interest because it implicated him in the commission or attempted commission of a robbery. The more difficult question is whether Moye's statement identifying the defendant as the individual who shot and killed the victim also was a statement against Moye's own penal interest. The majority concludes that it was because Moye "admitted his participation in a robbery that gave rise to a homicide and exposed himself to the possibility of a charge of felony murder. See General Statutes § 53a-54c." Part I A of the majority opinion. To arrive at this conclusion, the majority relies principally on this court's decision in *Rivera*.

The majority accurately describes the holding in *Rivera* and its significance in relation to the present case. In *Rivera*, the out-of-court declarant, Michael Glanville, allegedly confessed to his nephew that he was involved in the crimes with which the defendant,

State *v.* Graham

Anthony Rivera, had been charged—felony murder, burglary, arson, and tampering with evidence. See *State* v. *Rivera*, supra, 268 Conn. 352–54, 357. According to Glanville, he and Rivera broke into the victim's home in search of jewelry, and "Glanville . . . remained in the kitchen as a lookout as [Rivera] went through the house." Id., 359. When the victim found Glanville in the kitchen, Glanville "covered his face" and "ran out of the house," while Rivera "chok[ed] the victim" and "picked up [an oil] lamp . . . ." Id. On appeal, Rivera claimed that Glanville's out-of-court statement improperly was admitted into evidence as a statement against penal interest because "Glanville's statement . . . attempts to shift the blame from Glanville to [Rivera] and to minimize Glanville's own criminal involvement in the events." *State* v. *Rivera*, Conn. Supreme Court Briefs & Appendices, November Term, 2003, Defendant's Brief p. 23. To support his claim, Rivera relied in part on *Williamson* v. *United States*, 512 U.S. 594, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994), in which the United States Supreme Court held that the federal analogue to § 8-6 (4) of the Connecticut Code of Evidence, namely, rule 804 (b) (3) of the Federal Rules of Evidence,[3] "does not allow admission of non-self-

_____

[3] Rule 804 (b) of the Federal Rules of Evidence provides in relevant part: "The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

\* \* \*

(3) A statement that:

(A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

As we observed in *State* v. *Schiappa*, 248 Conn. 132, 147, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999), "we [have] expressly adopted the definition of statement against penal interest contained in [rule] 804 (b) (3)."

State *v.* Graham

inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. . . . [Courts] may not just assume for purposes of [r]ule 804 (b) (3) that a statement is self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else.'' Id., 600–601.

We rejected Rivera's claim, holding that Glanville's ''statement was squarely against [his] penal interest. Glanville admitted his participation in a burglary that had given rise to a homicide . . . and thus exposed himself to the possibility of a charge of felony murder. . . . [E]ven if Glanville's statement had attempted to minimize his participation in the homicide, the minimization would have been limited to one type of murder versus another type of murder. The statement further implicated Glanville as a principal in the crime of burglary, and an accomplice in the crimes of arson and tampering with evidence. Therefore, Glanville's statement exposed him to potential liability for the same types of crimes with which [Rivera had] been charged and, accordingly, the statement fully and equally implicated both Glanville and [Rivera].'' (Footnote omitted; internal quotation marks omitted.) *State* v. *Rivera*, supra, 268 Conn. 368. We also rejected Rivera's claim ''that the trial court improperly admitted Glanville's entire statement, instead of only the portions [in which] Glanville implicated himself,'' because, ''under our evidentiary law, '[when] the disserving parts of a statement are intertwined with self-serving parts, it is more prudential to admit the entire statement and [to] let the trier of fact assess its evidentiary quality in the complete context.' *State* v. *Bryant*, 202 Conn. 676, 696–97, 523 A.2d 451 (1987). But see *Williamson* v. *United States*, [supra, 512 U.S. 600–601] . . . .'' *State* v. *Rivera*, supra, 371 n.18.[4]

––––––––––

[4] *Rivera* contains no explicit reference to *Williamson* other than this ''But see'' citation and provides no analysis whatsoever of the United States

344 Conn. 825 OCTOBER, 2022 863

State *v.* Graham

The defendant's main brief does not acknowledge our holding in *Rivera* or its precedential effect. In his reply brief, the defendant makes a perfunctory effort to distinguish *Rivera* on the ground that, unlike Glanville's statement in *Rivera*, Moye's statement "did not fully and equally implicate [Moye] in all of the crimes and, thus, [was] not permissible." I agree with the majority that the present case is indistinguishable from *Rivera* because "Moye's statement was indeed inculpatory, as it exposed him to potential criminal liability for the same types of crimes with which the defendant was charged." Part I A of the majority opinion. Again, the defendant has not asked us to overrule *Rivera* or its conclusion that the felony murder rule renders an accomplice's out-of-court admission to a predicate felony enumerated in § 53a-54c "wholly inculpatory" for purposes of § 8-6 (4) of the Connecticut Code of Evidence, even if the accomplice's out-of-court statement accuses the defendant of being entirely responsible for the death of the victim.

Whatever one thinks of the ultimate conclusion in *Rivera*, our analysis in that case did not involve a robust or satisfactory evaluation of the admissibility of dual inculpatory statements that shift the blame to a defendant for the death of a victim in the context of the felony murder rule. The felony murder rule "is one of the most persistently and widely criticized features of American criminal law"; G. Binder, "The Origins of American Felony Murder Rules," 57 Stan. L. Rev. 59, 60 (2004); and its purpose is "to punish those whose conduct brought about an unintended death in the commission or attempted commission of a felony." (Internal quotation marks omitted.) *State* v. *Kyles*, 221 Conn.

Supreme Court's reasoning in *Williamson.* See *State* v. *Rivera*, supra, 268 Conn. 371 n.18.

State *v.* Graham

643, 667, 607 A.2d 355 (1992).[5] "The felony murder rule includes accidental, unintended deaths"; id.; and it makes an accomplice to a felony equally as culpable in the commission of a murder as the person who killed the victim, so long as the victim was killed "in the course of and in furtherance of" the underlying felony. General Statutes § 53a-54c; see *State* v. *Montgomery*, 254 Conn. 694, 733, 759 A.2d 995 (2000) ("[f]elony murder occurs when, in the course of and in furtherance of another crime, one of the participants in that crime causes the death of a person who is not a participant in the crime" (internal quotation marks omitted)). Thus, the felony murder rule invokes the counterintuitive principle that the participants to the underlying felony are legally guilty—and *equally* so—for a murder that any one of the participants may commit, even though the actual killer has substantially greater moral culpability. See *People* v. *Patterson*, 49 Cal. 3d 615, 621, 778

––––––––––

[5] Critics of the rule include the drafters of the Model Penal Code. See 2 A.L.I., Model Penal Code and Commentaries (1980) § 210.2, commentary, p. 37 (noting that it is difficult to find "[p]rincipled argument in favor of the [felony murder] doctrine"). The criticism is often expressed in extreme and colorful terms. "[I]t is said that the rule is, among other things, '[abhorrent],' 'anachronistic,' 'barbaric,' 'injudicious and unprincipled,' 'parasitic,' and a 'modern monstrosity' that 'erodes the relationship between criminal liability and moral culpability." (Footnotes omitted.) J. Tomkovicz, "The Endurance of the Felony-Murder Rule: A Study of the Forces That Shape Our Criminal Law," 51 Wash. & Lee L. Rev. 1429, 1441 (1994); see N. Roth & S. Sundby, "The Felony-Murder Rule: A Doctrine at Constitutional Crossroads," 70 Cornell L. Rev. 446, 446 (1985) ("[c]riticism of the rule constitutes a lexicon of everything that scholars and jurists can find wrong with a legal doctrine: it has been described as 'astonishing' and 'monstrous,' an unsupportable 'legal fiction,' 'an unsightly wart on the skin of the criminal law,' and as an 'anachronistic remnant' that has 'no logical or practical basis for existence in modern law' " (footnotes omitted)).

To be clear, my point here has nothing to do with whether the felony murder rule is worthy of criticism, and I express no view on the subject. The issue is whether a rule that many commentators consider illogical and unprincipled would nonetheless be known to a reasonable nonlawyer declarant in Moye's circumstances, whose statement identifies an accomplice as the murderer and, therefore, would qualify as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence.

State *v.* Graham

P.2d 549, 262 Cal. Rptr. 195 (1989) (felony murder rule "incorporates an artificial concept of strict criminal liability that erodes the relationship between criminal liability and moral culpability" (internal quotation marks omitted)).

In my view, the commonsense belief that the person who killed the victim is more culpable than the person who did not necessitates reconsideration of the legal issue decided without any in-depth analysis in *Rivera*, i.e., whether an accomplice's out-of-court statement identifying a codefendant as the perpetrator of a murder committed during the course of a felony should be treated as an inculpatory statement under § 8-6 (4) of the Connecticut Code of Evidence.

In order to explain my concern, it is necessary to briefly review the statement against penal interest exception to the hearsay rule in § 8-6 (4) of the Connecticut Code of Evidence and its underlying justification. The hearsay rule generally bars the use of out-of-court statements to prove the truth of the matter asserted—in this case, Moye's statement that the defendant shot and killed the victim. See, e.g., *State* v. *Saucier*, 283 Conn. 207, 223, 926 A.2d 633 (2007); Conn. Code Evid. § 8-1 (3). In concise terms, hearsay is inadmissible because the declarant cannot be cross-examined, thus depriving the adverse party of any ability to test the truth of the matter asserted using the greatest engine for the discovery of truth ever invented.[6] Without Moye on the witness stand, the defendant cannot directly challenge the veracity of his accusation.

---

[6] "In *Bishop* v. *Copp*, 96 Conn. 571, 575, 114 A. 682 (1921), Chief Justice [George W.] Wheeler said: 'The test of cross-examination is the highest and most indispensable test known to the law for the discovery of truth.' Wigmore, speaking even more strongly, said that cross-examination 'is beyond any doubt the greatest legal engine ever invented for the discovery of truth.' 5 [J.] Wigmore, Evidence (Chadbourn Rev. 1974) § 1367, p. 32." *State* v. *Dabkowski*, 199 Conn. 193, 202, 506 A.2d 118 (1986).

State *v.* Graham

The hearsay exception for statements against penal interest rests on the premise that such statements generally are trustworthy because people typically do not make statements confessing to criminal conduct unless those statements are true. See, e.g., *State* v. *Bryant*, 202 Conn. 676, 701, 523 A.2d 451 (1987) ("the ultimate question [under the statement against penal interest exception is] whether a reasonable man in [the declarant's] position would not have made the statement[s] unless he believed [them] to be true" (internal quotation mark omitted)). As the United States Supreme Court has explained, the exception "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson* v. *United States*, supra, 512 U.S. 599; see *Lilly* v. *Virginia*, 527 U.S. 116, 126–27, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999) ("[t]he exception . . . is founded on the broad assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made" (internal quotation marks omitted)).

It necessarily follows from this premise that the presumption of trustworthiness is warranted only if the declarant makes the statement *knowing* that it is against his penal interest. Although an accidental or unknowing admission of wrongful conduct may or may not be true, it will not contain the assurance of trustworthiness that justifies the hearsay exception against penal interest because the speaker is, by definition, unaware of its self-injurious potential. This point is not debatable as a matter of logic, but it creates a serious difficulty in application because its enforcement would require a showing of the declarant's subjective state of mind—actual knowledge that the admitted conduct exposes the declarant to penal consequences—before the statement could be deemed against the declarant's

State *v.* Graham

penal interest. See *United States* v. *Lozado*, 776 F.3d 1119, 1125 (10th Cir. 2015) (recognizing that, "[w]ithout awareness that the statement could have adverse consequences, the statement lacks circumstantial guarantees of trustworthiness").

As legal scholars have observed, an inquiry into the declarant's subjective state of mind is problematic in this context due to the "[d]ifficulties of proof, probabilities, and the unavailability of the declarant . . . ." 2 R. Mosteller, McCormick on Evidence (8th Ed. 2020) § 319, p. 577; see J. Cronan, "Do Statements Against Interest Exist? A Critique of the Reliability of Federal Rule of Evidence 804 (b) (3) and a Proposed Reformulation," 33 Seton Hall L. Rev. 1, 13 (2002) (recognizing that, "[b]ecause of the declarant's unavailability, conclusive proof of actual awareness is often impossible"). Section 8-6 (4) of the Connecticut Code of Evidence, like its federal counterpart, avoids this problem, at least in part, by establishing an *objective* standard to determine whether a statement is against a declarant's penal interest. Thus, under our rule (and the cognate federal rule), the question is whether "*a reasonable person in the declarant's position*" would understand the statement "to subject the declarant to criminal liability . . . ." (Emphasis added.) Conn. Code Evid. § 8-6 (4); accord Fed. R. Evid. 804 (b) (3) (A).

And so we arrive at the difficult question that this court answered, without examination or explanation, in *Rivera*: would a reasonable person who confesses to his participation in a robbery, but who states that an accomplice shot and killed the target of the robbery, have understood that he was exposing himself to criminal liability for the crime of felony murder? As applied to the present case, the precise question is whether Moye's statement about the defendant's shooting the victim during the course of a robbery or attempted robbery objectively would have been perceived by Moye

State *v.* Graham

at the time the statement was made as a statement against Moye's own penal interest. If the answer is yes, then the statement is inculpatory and admissible under § 8-6 (4) of the Connecticut Code of Evidence, provided it otherwise was sufficiently trustworthy. See, e.g., *State* v. *Patel*, 342 Conn. 445, 477, 270 A.3d 627 (2022) ("[a]dmission of a hearsay statement pursuant to § 8-6 (4) of the Connecticut Code of Evidence is subject to a binary inquiry: (1) whether [the] statement . . . was against [the declarant's] penal interest and, if so, (2) whether the statement was sufficiently trustworthy" (internal quotation marks omitted)), petition for cert. filed (U.S. August 18, 2022) (No. 22-155). If the answer is no, however, the statement is exculpatory and "presumptively unreliable" because it was "offered to prove the guilt of an accomplice of the declarant." Id., 481; see id. (recognizing that statements in which accomplice attempts to "[shift] blame from himself to the defendant" or "curry favor with the government" historically have been viewed as "presumptively unreliable" and inadmissible under statement against penal interest exception to hearsay rule).

In *Rivera*, we assumed that the answer to the aforementioned question was "yes" and that the statement was wholly inculpatory because, by operation of the felony murder rule, a dual inculpatory statement regarding the commission of a predicate felony during the course of which an individual is killed necessarily implicates both the accomplice/declarant and the perpetrator/defendant "fully and equally" in the crime of felony murder. *State* v. *Rivera*, supra, 268 Conn. 368. Our conclusion in *Rivera* may be correct, but I have serious doubts, and, in my view, the holding warrants careful reconsideration because *Rivera* itself contains no analysis. It is hardly obvious that a reasonable nonlawyer who points the finger for a murder at an accomplice

State *v.* Graham

to a robbery is aware of the "illogical"[7] workings of the felony murder rule such that the statement qualifies as one against the declarant's own penal interest. As one court has observed, whether a declarant in such circumstances would have "understood that his statement was a confession to murder is not clear." *Smith* v. *State*, 746 So. 2d 1162, 1168 (Fla. App. 1999), review denied, 767 So. 2d 461 (Fla. 2000). When a declarant admits that he was guilty of a predicate felony but appears to try "to absolve himself of criminal responsibility for [a] murder," the confession to the predicate felony operates as "a confession to the murder" as a matter of law, but it is not apparent that the declarant "would . . . have known that unless he understood the operation of the felony murder rule at the time [the confession was made]." Id. The declarant "may have been unaware of the felony murder rule. If so, he would not be the first defendant who unwittingly confessed to murder thinking that he was admitting [to] only a less serious offense." Id. If "[t]he record does not disclose any fact or circumstance to suggest that [the declarant] understood the potential harm he caused to himself by making the statement," a court "cannot say with any confidence that a reasonable person in his position would have thought that the statement was true." Id. Under such circumstances, the out-of-court statement is inadmissible as a declaration against penal interest because it does not "[tend] to subject the declarant to criminal liability [such] that a reasonable person in the same position would not have made the statement unless he or she believed it to be true . . . ."[8] Id., 1167; see Conn. Code Evid. § 8-6 (4).

[7] See footnote 5 of this opinion.

[8] It should be obvious that the familiar maxim that ignorance of the law is no excuse has no application in the present context. The issue is not whether ignorance of the law excuses the declarant's criminal conduct but, rather, whether the declarant's statement should be considered trustworthy because people usually do not knowingly confess to crimes unless they are being truthful. If knowledge of illegality is presumed, then the entire premise of the hearsay exception loses all force.

State *v.* Graham

If some of a declarant's out-of-court statements are inculpatory and admissible as declarations against penal interest, but other out-of-court statements are exculpatory and inadmissible, this court would need to address the issue that the majority leaves unresolved, namely, whether to adopt the approach to dual inculpatory statements of accomplices articulated by the United States Supreme Court in *Williamson* v. *United States*, supra, 512 U.S. 599–601. In that case, the court construed the federal counterpart to § 8-6 (4) of the Connecticut Code of Evidence to prohibit the admission of "collateral statements" that are not "self-inculpatory . . . ." Id., 600. The court explained that the animating principle of the exception to the hearsay rule—that people do not confess to crimes that they did not commit—does not extend to collateral, exculpatory statements: "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." Id., 599–600. The court observed that "[s]elf-exculpatory statements are exactly the ones [that] people are most likely to make even when they are false; and mere proximity to other, self-inculpatory statements does not increase the plausibility of the self-exculpatory statements." Id., 600. Accordingly, the federal rule "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." Id., 600–601. My research reveals that many states interpret their own analogous statement against penal interest hearsay exceptions in a similar manner. See, *Smith* v. *State*, 647 A.2d 1083, 1088 (Del. 1994) ("As the [United States Supreme] Court in *Williamson* held, there is no theoretical basis for the admission of neutral, collateral statements. . . . Non-self-incriminatory

State *v.* Graham

components of a declaration purportedly falling within [rule] 804 (b) (3) [of the Delaware Rules of Evidence] are presumptively inadmissible hearsay because they cannot claim any special guarantees of reliability and trustworthiness.'' (Citations omitted; footnote omitted.)); *Commonwealth* v. *Brown*, 617 Pa. 107, 176–77, 52 A.3d 1139 (2012) (adopting *Williamson* approach and holding that ''only the introduction of the portion or portions of an out-of-court statement [that] are self-inculpatory to the declarant'' are admissible as statements against penal interest); *State* v. *Holmes*, 342 S.C. 113, 118, 536 S.E. 2d 671 (2000) (''non-self-inculpatory statements made collateral to a self-inculpatory statement are inadmissible'' as statements against penal interest), cert. denied, 532 U.S. 906, 121 S. Ct. 1230, 149 L. Ed. 2d 139 (2001); *State* v. *Roberts*, 142 Wn. 2d 471, 494–95, 14 P.3d 713 (2000) (adopting *Williamson* approach to admissibility of declarations against penal interest and holding that ''[t]he 'whole statement' approach is . . . both overbroad and underbroad'').

The defendant in the present case has not raised or briefed these issues. Nor has he asked us to revisit our conclusion in *Rivera* that the dual inculpatory statement of an accomplice that shifts blame to a codefendant is wholly inculpatory under the felony murder rule. In the absence of full briefing and explication of these complex legal questions, I leave their resolution for another day. Accordingly, I concur in the judgment with respect to part I A of the majority opinion.