******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RICKEY TRAYNHAM
## (SC 20883)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

### *Syllabus*

Convicted of murder, robbery in the first degree, conspiracy to commit robbery in the first degree, carrying a pistol without a permit, and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to this court. The defendant claimed that the trial court had improperly admitted testimony from two witnesses, S and J, about certain statements that R, the defendant's accomplice, had made to them under the statement against penal interest exception to the hearsay rule set forth in the Connecticut Code of Evidence (§ 8-6 (4)). *Held*:

The trial court did not abuse its discretion in admitting the testimony of S and J about R's statements, which inculpated both R and the defendant, under § 8-6 (4) of the Code of Evidence, as R's statements to S and J were against R's penal interest and were sufficiently trustworthy.

The defendant conceded that the challenged statements were against R's penal interest, and those statements were trustworthy insofar as R made them voluntarily, in close temporal proximity to the crimes, and to people with whom R had a trusting relationship, namely, a romantic partner, S, and a close family member, J.

Moreover, R's statements were corroborated by the evidence presented at trial, and, although there were some discrepancies between R's statements to J and the evidence presented at trial, this court concluded that those inconsistencies, on balance, did not undermine the trustworthiness of the statements to J.

Furthermore, although defendant claimed that R's statements were not trustworthy because R had engaged in blame shifting by attempting to minimize his participation in the homicide, R's statements to S and J nevertheless exposed him to the risk of criminal liability for the same type of crimes with which the defendant was charged, and, therefore, fully and equally implicated both R and the defendant.

Argued May 15—officially released July 22, 2025

### *Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, robbery in the first degree, conspiracy to commit robbery in the first

degree, carrying a pistol without a permit, and criminal possession of a firearm, brought to the Superior Court in the judicial district of New Haven, where the charges of felony murder, murder, robbery in the first degree, and conspiracy to commit robbery in the first degree were tried to the jury before *Vitale, J.*; verdict of guilty; thereafter, the charges of carrying a pistol without a permit and criminal possession of a firearm were tried to the court, *Vitale, J.*; finding of guilty; subsequently, the court vacated the felony murder conviction and rendered judgment of guilty of murder, robbery in the first degree, conspiracy to commit robbery in the first degree, carrying a pistol without a permit, and criminal possession of a firearm, from which the defendant appealed to this court. *Affirmed.*

*Chad L. Edgar*, assigned counsel, for the appellant (defendant).

*Meryl R. Gersz*, assistant state's attorney, with whom, on the brief, were *John Doyle, Jr.*, state's attorney, *Seth Garbarsky*, supervisory assistant state's attorney, and *Gregory Borrelli*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. The defendant, Rickey Traynham, in collaboration with his accomplice, Jordan Rudel, conspired to rob the victim, Rondell Atkinson. After telling the victim that they would pay him for a ride in his vehicle, the defendant and Rudel forced the victim to drive to a park in Woodbridge. Upon arriving at the park, the defendant and Rudel ordered the victim out of the car and took his wallet, watch, and cell phone. Both men then brandished firearms and each shot the victim, fatally wounding him. After the shooting, Rudel confided in two people about what he and the defendant had done to the victim: Adrianna Santiago, his then girlfriend and the mother of his children; and Monique

Jackson, his father's longtime girlfriend. In the present case, the trial court permitted the state to introduce Rudel's statements to Santiago and Jackson into evidence against the defendant as dual inculpatory statements under the statement against penal interest exception to the hearsay rule.[1]

The sole issue in this direct appeal[2] is whether the trial court improperly allowed the testimony from Santiago and Jackson as dual inculpatory statements under the statement against penal interest exception to the hearsay rule. Because Rudel's statements were indisputably against his penal interest and were sufficiently trustworthy, we affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the defendant's claim. On June 7, 2021, the night he was killed, the victim was working as an unofficial rideshare driver—providing rides for hire without working through a rideshare company, such as Uber or Lyft. At some point that night, the defendant and Rudel made plans to hire the victim as a rideshare driver and then rob him. When the victim picked them up, Rudel and the defendant instructed him to drive to a park in Woodbridge. Once there, the defendant and Rudel robbed the victim of his belongings and killed him.

---

[1] After a trial, the jury found the defendant guilty of felony murder in violation of General Statutes § 53a-54c, murder in violation of General Statutes §§ 53a-8 (a) and 53a-54a (a), robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes § 53a-48 (a) and § 53a-134 (a) (2). The felony murder conviction was vacated at sentencing as violative of double jeopardy. The state also charged the defendant with carrying a pistol without a permit in violation of General Statutes (Rev. to 2021) § 29-35 (a) and criminal possession of a firearm in violation of General Statutes (Rev. to 2021) § 53a-217 (a) (1). Following a bench trial, the court found the defendant guilty of those firearms charges as well. The court imposed a total effective sentence of eighty years of incarceration.

[2] See General Statutes § 51-199 (b) (3).

On June 8, 2021, a passerby found the body of the victim at the Pease Road playground in Woodbridge. The victim had been shot multiple times. Once the police arrived, they located seven spent shell casings near the victim's body. The victim did not have any identification or other personal belongings on his person. The victim's vehicle also was missing.

After the murder, also on June 8, 2021, Rudel called Santiago. At that time, Santiago was on vacation in Florida, so he used the FaceTime feature to show her the driver's license of a man. Rudel then told Santiago to search for the man's name on the Internet. Santiago searched the Internet for the man's name and discovered that he was the victim of a homicide. When Santiago asked Rudel what he had done, he said he would not discuss it over the phone and hung up.

On or around June 14, 2021, Santiago returned home from Florida. She met Rudel in Waterbury, and they sat in her vehicle and spoke for approximately two hours. Rudel explained that he and the defendant, known to Santiago as "Slikk," had created a plan to rob the victim. On the evening of the murder, the victim picked up Rudel from Santiago's house and took him to the defendant's house on Fountain Street in New Haven. When the defendant entered the back seat, he put a gun to the victim's head and ordered him to drive to a park in Woodbridge.

According to Santiago, Rudel told her the following additional details about the murder. Once they arrived at the park, Rudel and the defendant forced the victim to get out of the vehicle and to start walking. They told the victim to disconnect his iCloud account, to erase his passwords, and to turn off the Find My Phone function on his cell phone. They then took the cell phone. At that point, the victim started praying, which annoyed Rudel. Rudel told the victim to "shut up" and then

shot him in the leg. The victim fell to the ground. The defendant then became concerned, saying that he did not want to go to jail and that the victim had seen their faces and knew where they lived. Consequently, the defendant walked over to the victim and shot him four to five times. They then took the victim's wallet and cell phone and left the park in the victim's vehicle. Their plan had been to rob the victim and to leave him in the park, but when Rudel shot the victim in the leg, it "mess[ed] [their] plans up."

Approximately five days after the murder, on June 12, 2021, Rudel went to see Jackson, his father's longtime girlfriend, with whom he had a close relationship. According to Jackson, Rudel told her the following about the murder. He said that "he fucked up . . . ." He then showed her a driver's license belonging to someone with the last name of Atkinson. Jackson recognized the name as being associated with a murder that she had seen in the news. Rudel then explained to her that he and one or two other people planned to rob a rideshare driver whom he knew from previous rides. Rudel said that he had the rideshare driver pick him up down the street from where Santiago lived, then he and the rideshare driver picked up the other men. Rudel did not identify the other men. Rudel said that they went to a park in Woodbridge. Rudel told Jackson that, after the men arrived at the park, he shot the driver in the leg once or twice. He then told her that the other men then became concerned that the victim had seen their faces, so they "finished him off." Rudel told Jackson that they then put the victim's body in the vehicle and submerged the vehicle in the water.

Prior to trial, the state filed a motion in limine in which it sought, in pertinent part, to admit into evidence Rudel's statement to Jackson. The state asserted that Rudel was unavailable to testify because he planned to invoke his fifth amendment right against self-incrimina-

tion and that the statement was admissible under Connecticut Code of Evidence § 8-6 (4) because it was against his penal interest and was trustworthy. Thereafter, the defendant filed a motion to suppress, which the trial court treated as a motion in limine, in which he argued that all of Rudel's statements, including those to Jackson and Santiago, should be suppressed. Although the defendant conceded that the statements were not testimonial and were against Rudel's penal interest, he claimed that they should be suppressed because they were not trustworthy or corroborated.

The trial court denied the defendant's motion to suppress. In ruling on the state's motion and the defendant's motion, the court noted that the defendant had conceded that the statements were not testimonial. Thus, the court explained, the admissibility of these statements was governed solely by the rules of evidence and did not implicate the confrontation clause.[3] Accordingly, the trial court analyzed the admission of the statements under the hearsay exception for statements against penal interest. See Conn. Code Evid. § 8-6 (4). The trial court explained that the statements were against Rudel's penal interest, and, "after considering the totality of the circumstances," the court "conclude[d] that the statements made by Rudel to Jackson and Santiago [were] admissible under the Connecticut Code of Evidence [§] 8-6 (4) . . . ." As a result, at trial, Santiago and Jackson testified about the events relayed to them by Rudel. Rudel continued to invoke his privilege against self-incrimination and, therefore, did not testify at trial.

We begin with the standard of review and relevant legal principles. "The law regarding out-of-court state-

---

[3] Notwithstanding the trial court's statement that the defendant conceded that his confrontation rights were not implicated, the court, in an abundance of caution, nevertheless determined that admitting Rudel's statements into evidence did not violate the defendant's confrontation rights. The defendant does not renew any constitutional claim on appeal.

ments admitted for the truth therein is well settled. An out-of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule. . . . Section 8-6 (4) of the Connecticut Code of Evidence carves out an exception to the hearsay rule for an out-of-court statement made by an unavailable declarant if the statement was trustworthy and, at the time of its making, so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true." (Citation omitted; internal quotation marks omitted.) *State* v. *Graham*, 344 Conn. 825, 835, 282 A.3d 435 (2022). "[W]hen viewing this issue through an evidentiary lens, we examine whether the trial court properly exercised its discretion." (Internal quotation marks omitted.) Id., 836–37.

In the present case, the state offered Rudel's statements as dual inculpatory statements. "A dual inculpatory statement is a statement that inculpates both the declarant and a third party, in this case the defendant." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 359, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). "We evaluate dual inculpatory statements using the same criteria that we use for statements against penal interest." Id.

Admission of a hearsay statement against penal interest pursuant to § 8-6 (4) of the Connecticut Code of Evidence "is subject to a binary inquiry: (1) whether [the] statement . . . was against [the declarant's] penal interest and, if so, (2) whether the statement was sufficiently trustworthy." (Internal quotation marks omitted.) *State* v. *Bonds*, 172 Conn. App. 108, 117, 158 A.3d 826, cert. denied, 326 Conn. 907, 163 A.3d 1206 (2017); see also, e.g., *State* v. *Pierre*, 277 Conn. 42, 67, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct.

2873, 165 L. Ed. 2d 904 (2006). Dual inculpatory statements, such as those inculpating both the declarant and the defendant, are admissible if the circumstances demonstrate that the statements are trustworthy. See, e.g., *State* v. *Camacho*, supra, 282 Conn. 361–63. Because the defendant concedes that Rudel's statements were against his penal interest, only the second part of this inquiry, whether the statements were sufficiently trustworthy, is at issue in this appeal.

When assessing the trustworthiness of such statements, our Code of Evidence directs trial courts to consider the following factors: "(A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest." Conn. Code Evid. § 8-6 (4). "[N]o single factor . . . is necessarily conclusive. . . . Thus, it is not necessary that the trial court find that all of the factors support the trustworthiness of the statement. The trial court should consider all of the factors and determine whether the totality of the circumstances supports the trustworthiness of the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Lopez*, 254 Conn. 309, 316, 757 A.2d 542 (2000); see also *State* v. *Patel*, 342 Conn. 445, 450, 477, 270 A.3d 627 (finding that there was no abuse of discretion when trial court admitted into evidence codefendant's dual inculpatory statement to jailhouse informant), cert. denied,     U.S.    , 143 S. Ct. 216, 214 L. Ed. 2d 86 (2022). We consider each of these factors in turn.

Rudel made the statements to Jackson and Santiago in close temporal proximity to the crimes. Rudel spoke to Jackson approximately five days after the crimes and to Santiago the day after the crimes and then again approximately one week later. As this court has explained, "[i]n general, declarations made soon after the crime

suggest more reliability than those made after a lapse of time [when] a declarant has a more ample opportunity for reflection and contrivance." (Internal quotation marks omitted.) *State* v. *Camacho*, supra, 282 Conn. 361; see also *State* v. *Pierre*, supra, 277 Conn. 70–72 (statements against penal interest made within "couple of weeks" of homicide were trustworthy); *State* v. *Rivera*, 268 Conn. 351, 370–71, 844 A.2d 191 (2004) (dual inculpatory statement made within five months of homicide was trustworthy). Therefore, in the present case, the timing of the statements, just days after the murder, supports their trustworthiness.

In addition, the persons to whom the statements were made also support their trustworthiness. "[W]e note that the declarant's making the contested statements of his own volition, to people with whom he had a trusting relationship . . . is further indication of the reliability of the statements." *State* v. *Camacho*, supra, 282 Conn. 361. As the trial court found, Rudel, on his own initiative, made the statements to "a close family member and a romantic partner." The evidence at trial demonstrated that Jackson was the longtime girlfriend of Rudel's father and that Rudel would often visit her and talk to her about what was going on in his life.[4] Specifically, the court found that, when Rudel made his statement to Jackson, Rudel went to Jackson's home of his own volition, unannounced, and told her, "listen, I need to talk, and I think I really [fucked] up." Additionally, Santiago is the mother of Rudel's children and was his girlfriend at the time of the crimes. This bespeaks of a trusting relationship. See, e.g., *State* v. *Pierre*, supra,

[4] The defendant asserts that the statement to Jackson may be less trustworthy because Jackson overstated her relationship with Rudel and had known him for only a short time before he told her about the murder. We disagree. The trial court's finding that Rudel and Jackson had a close familial relationship is supported by the evidence, and we cannot conclude that the trial court abused its discretion in finding that this factor supported the trustworthiness of Rudel's statement to Jackson.

277 Conn. 69–70 (finding implication of reliability when declarant "made the statements on his own initiative, to an individual who was a friend and someone he routinely socialized with, and not in the coercive atmosphere of official interrogation" (internal quotation marks omitted)); *State* v. *Rivera*, supra, 268 Conn. 369–70 (that statement was made, "upon [witness'] own initiative, to a close family member, and not in the coercive atmosphere of official interrogation," was strongly indicative of statement's reliability (internal quotation marks omitted)).

Further, we are unpersuaded by the defendant's argument that this factor ignores the possibility that Rudel may have been motivated to minimize his role in the crimes when speaking to a family member. As the defendant acknowledges, his argument is not supported by the case law. See *State* v. *Graham*, supra, 344 Conn. 843 ("It is well settled that statements made to friends and close associates 'are significantly more trustworthy than statements obtained by government agents for the purpose of creating evidence that would be useful at a future trial. . . . In short, neither facing arrest nor being under arrest when making his statements to [the witness], [the declarant] lacked the obvious incentive to shift blame or [to] curry favor with the police.' "). Moreover, a review of Rudel's statements in the present case demonstrates that Rudel admitted to his role in the planning and commission of the robbery and to being the first person to shoot the victim. Accordingly, we agree with the trial court that this factor supports the court's decision to admit the statements into evidence.

Turning to the second factor, whether there was corroborating evidence in the case, we conclude that this factor also supports the trial court's decision to admit Rudel's statements into evidence. Rudel admitted that he and the defendant planned to rob a rideshare driver but that their plan went awry and resulted in murder.

The evidence at trial established that the victim was a rideshare driver and was found without any of his personal belongings, including his wallet and cell phone. Significantly, while making his statements to Santiago and Jackson shortly after the murder, Rudel showed them both a driver's license belonging to the victim. Rudel also told both Santiago and Jackson that he and another individual took the victim to a park in Woodbridge, consistent with the location of where the victim's body was found.

In addition to the foregoing, Rudel's statements about the shooting itself were corroborated by the facts established at trial. Rudel told Santiago and Jackson that both he and the other participant had guns and that they both shot the victim. Indeed, Rudel said that he shot the victim once or twice in the leg and that the other participant shot the victim four or five times. These details are consistent with the forensic evidence presented at trial. The police recovered seven shell casings at the scene, and the testing revealed that two of the casings were fired from one firearm and five of the casings were fired from another firearm. Furthermore, the police found two guns in the car belonging to the defendant's girlfriend, and the ballistics testing demonstrated that they were consistent with the guns used during the crimes. The medical examiner's testimony also corroborated Rudel's statements to Santiago and Jackson that Rudel fired one or two shots into the victim's leg. Thus, the existence of the other five casings at the scene not attributable to Rudel also corroborates Rudel's statement to Santiago that the defendant fired multiple shots.

The defendant asserts that the trustworthiness of Rudel's statements was undermined by the "material differences" between his statement to Jackson and the evidence presented at trial. Specifically, the defendant asserts that the evidence did not corroborate what

Rudel told Jackson, namely, that there were multiple participants in the crimes other than himself, that they put the victim's body in the trunk of the car, and that they then submerged the car in water. Although there were some discrepancies between Rudel's statement to Jackson and the other evidence presented at trial, we cannot conclude that such discrepancies demonstrate that the trial court abused its discretion in admitting Rudel's statements to Jackson and Santiago into evidence.

Indeed, the trial court addressed the discrepancies and concluded that they did not undermine the reliability of Rudel's statement to Jackson. Specifically, with respect to Rudel's statement that there were multiple participants in the crimes, the court concluded that, "at the crucial time the events actually unfolded in the park in Woodbridge, according to what [Jackson] indicated, [Jackson] recalls that Rudel . . . describes just 'the other guy that he was with,' which is a singular term, meaning used in the singular; and 'whoever the other guy is, had a gun as well,' again, singular; and maintained that both Rudel and 'the other guy fired their weapons,' although the other guy was unnamed." Thus, the court concluded that, when the murder occurred, Rudel told Jackson about only himself and one other man.

With respect to Jackson's testimony that Rudel told her that they had placed the victim's body in the trunk of the victim's car and submerged the car in water, the trial court acknowledged that this portion of the statement was inconsistent with the evidence. As the court noted, however, "[t]he fact that some of [Rudel's] statements may contradict [with], or differ from, each other or other evidence is not fatal to their admission." The court pointed out that the "alleged inconsistencies pale in comparison to the myriad details of the crime[s] that Rudel shared with [Jackson] and [Santiago] that overlap and that could only be known to a participant in the crime[s]." In particular, the court highlighted the

following consistencies: "[T]he name and license of [the victim], the town [in which] the robbery occurred, [that] the location was a park, [that there were] multiple shots at the crime scene . . . [including] the shot to the [victim's] leg, and the fact that [the victim] was [a rideshare] driver."

We agree with the trial court that the inconsistencies, on balance, did not undermine the trustworthiness of Rudel's statement to Jackson and, accordingly, conclude that the court did not abuse its discretion in allowing Jackson's testimony. It was within the court's discretion to weigh those inconsistencies against the other evidence, and we find nothing untoward in its weighing or analysis. See, e.g., *State* v. *Patel*, 194 Conn. App. 245, 275, 221 A.3d 45 (2019) ("It was within the trial court's discretion to evaluate the consistencies and inconsistencies to conclude that, on balance, the second factor weighed in favor of a determination that the statements are reliable. Indeed, the trial court noted the inconsistencies identified by the defendant and found that they 'pale[d] in comparison to the myriad details of the crime that could only be known to a participant in the crime.' "), aff'd, 342 Conn. 445, 270 A.3d 627, cert. denied, U.S. , 143 S. Ct. 216, 214 L. Ed. 2d 86 (2022). In the present case, the trial court explained that, in conformance with *Patel*, it had "evaluated the foregoing consistencies and inconsistencies and conclude[d] . . . that, on balance, the statements to . . . Jackson are reliable and admissible under [§] 8-6 (4) [of the Connecticut Code of Evidence]." Therefore, we find no abuse of discretion as to the second factor in view of the myriad of corroborating evidence presented at trial.

We now turn to the third factor, namely, the extent to which Rudel's statements were against his penal interest. Although the defendant concedes that Rudel's statements were against his penal interest, he asserts

that the third factor does not support the trustworthiness of Rudel's statements because Rudel engaged in blame shifting. Specifically, the defendant asserts that Rudel attempted to minimize his participation in the homicide by stating that the defendant was the one who shot the victim five times and that these shots were the ones that killed the victim. We disagree.

As this court explained in *State* v. *Graham*, supra, 344 Conn. 825, "[t]he essential characteristic as to what is against penal interest is the exposure to risk of punishment for a crime." (Internal quotation marks omitted.) Id., 837. In *Graham*, the declarant "admitted his participation in a robbery that gave rise to a homicide and exposed himself to the possibility of a charge of felony murder" while also stating that it was the defendant who shot and killed the victim. Id. This court concluded that, although the declarant's statement was intended to distance the declarant from the murder or to minimize his participation in the crimes, the declarant's "statement was indeed inculpatory, as it exposed him to potential criminal liability for the same types of crimes with which the defendant was charged. A difference in degree of inculpation, rather than in kind, does not affect the conclusion that it is still an inculpatory statement." Id., 838. In the present case, Rudel's statements to both Santiago and Jackson exposed him to the risk of punishment for several crimes. He inculpated himself in the crimes by stating that he had helped to plan and had participated in the robbery of the victim, thus exposing himself to a charge of felony murder. He also told them that he had shot the victim in the leg once or twice.

In *State* v. *Rivera*, supra, 268 Conn. 351, this court addressed a similar factual situation. In *Rivera*, the declarant had "admitted his participation in a burglary that had given rise to a homicide, and thus exposed himself to the possibility of a charge of felony murder.

As the trial court correctly noted, even if [the declarant's] statement had attempted to minimize his participation in the homicide, the minimization would have been limited to 'one type of murder versus another type of murder.' The statement further implicated [the declarant] as a principal in the crime of burglary, and [as] an accomplice in the crimes of arson and tampering with evidence. Therefore, [the declarant's] statement exposed him to potential liability for the same types of crimes with which the defendant has been charged and, accordingly, the statement fully and equally implicated both [the declarant] and the defendant." (Footnote omitted.) Id., 368.[5]

Similarly, in the present case, Rudel's statements simply put forth a difference in degree of inculpation, not a difference in kind. Indeed, like in *Rivera*, even if Rudel's statement that he shot the victim only in the leg was an attempt to minimize his participation in the homicide, that minimization does not affect the conclusion that his statements to Jackson and Santiago were inculpatory. Attributing the final gun shots to the defendant simply means that Rudel was guilty of "one type of murder versus another type of murder." (Internal quotation marks omitted.) Id. Put differently, the statements exposed Rudel to potential liability for the same types of crimes, i.e., felony murder and robbery, with which the defendant has been charged. Thus,

---

[5] In his brief, the defendant asserts that "felony murder charges present unique challenges in the context of dual inculpatory statements by an accomplice whose statement engages in blame shifting" by inculpating himself in the underlying felony while exculpating himself in the murder. Citing to the concurring opinion in *State* v. *Graham*, supra, 344 Conn. 858 (*Ecker, J.*, concurring), the defendant asserts that "an overturning of *Rivera* for the purpose of this appeal would be welcome . . . ." He does not, however, expressly ask us to do so or provide briefing in that regard, and, at oral argument, the defendant's appellate counsel conceded that he was not asking this court to overrule *Rivera* or *Graham*. Accordingly, we do not address this issue.

because Rudel's statements fully and equally implicated both himself and the defendant, we cannot conclude that the trial court abused its discretion in concluding that this factor supported a finding that the statements were trustworthy.

The judgment is affirmed.

In this opinion the other justices concurred.